[Civil No. 3323.   Filed November 10, 1933.]

[26 Pac. (2d)  355.]

SADIE YOUNG, Widow of DAN YOUNG, Deceased, KNUTE YOUNG, BILLIE YOUNG and JACK YOUNG, Minor Children of Said Deceased, Petitioners, v. HODGMAN & MAC VICAR, Defendant Employer, THE INDUSTRIAL COMMISSION OF ARIZONA, Defendant-Insurance Carrier, Respondents.

Mr. C. H. Young and Mr. H. S. McCluskey, for Petitioners.

Mr. Don C. Babbitt (Mr. Emil Wachtel, of Counsel), for Respondent Commission.

PER CURIAM.—On September 19, 1931, Dan Young died at his home in Safford, Arizona, as the autopsy showed, from a fracture of his skull, at a point approximately between his right eye and right ear, or, as the doctor put it, "on the right side in the middle fossa of the skull at its anterior part." The autopsy also showed that a hemorrhage resulted from the fracture and formed a well-clotted and organized blood clot, of probably three ounces, discus shape, at or near the fracture and between the dura mater and the skull. The medical experts were not able, from the looks of the fracture and the condition of the blood clot, to state how long before his death he had received his injury. It was estimated by the medical experts all the way from twenty-four hours to several months or a year or more.

His wife, Sadie Young, and three minor children, Knute, Billie and Jack, applied to the Industrial Commission for an allowance of death benefits upon the ground that Dan Young's injury arose out of and in the course of his employment by Hodgman & Mac Vicar, in road construction work between Winslow and Payson, Arizona, and made the Industrial Commission a party because the employer had insured against liability in the State Compensation Fund. The commission, after a long and painstaking investigation of the claim, refused compensation, and the applicants by writ of *certiorari* have brought the record here for review.

The question throughout was whether Dan Young suffered his head injury while working for Hodgman & Mac Vicar. He was employed by this firm in its

road construction from about July 18 to September 5, 1931. On August 18th, while working with a tractor used for clearing right of way for the road, he stepped or slipped against a rock and hurt his ankle. He went into Winslow on the 19th and saw Dr. J. W. Bazell, who treated his injury, which was slight. He lost but one day on account of it. While in Winslow he obtained some medicine for headache, and he wrote his wife from there:

"I have had the headache so bad for the last ten days that I could hardly keep going. I am going to try and get something for it while I am here."

On September 24th Sadie Young wrote the Industrial Commission:

"I regret very much to have to advise you that my husband Dan Young passed away on Saturday September 19th, 1931, at 10:45 P. M. from injuries to his head received at the time he got his foot injury.

"You will please be advised that at the time he was hurt he was thrown on his head causing a blood tumor in the front of his head that finally caused his death according to the Doctors' judgment."

This letter, the employer's and doctor's reports apparently were treated as an application by Dan Young for compensation, for on October 15, 1931, the Industrial Commission made findings thereon to the effect that applicant was entitled to medical and surgical treatment on account of injury to his ankle, and that the commission had paid these. No compensation was awarded, because he was incapacitated only one day.

Thereafter, on October 29, 1931, Sadie Young made a motion for a "rehearing in the matter of the application of Dan Young for workmen's compensation," alleging that on or about August 1st, while Dan Young was attempting to extinguish a fire on or near the right of way for road "a large limb from a burning tree fell from above and struck the said Dan

Young on the head, knocking him to the ground . . . That because of said limb falling on the said Dan Young, he was seriously and dangerously injured, from which serious and dangerous injury the said Dan Young did die on the 19th day of September, 1931."

The commission held five hearings, at which evidence was taken for and against the claim. The first of such hearings was held November 10th, 11th and 12th, 1931, at Phoenix, Taylor and Showlow; the second, March 30, 1932, at Phoenix; the third, June 14th, at Globe; the fourth, July 12th, at Safford; and the fifth, July 15th, at Phoenix.

On January 5, 1933, the commission, among others of its findings, found: "That the evidence is insufficient to establish the death of said Dan Young was the result of any injury by accident arising out of and in the course of his said employment" by Hodgman & Mac Vicar. It is the contention of petitioners that they sustained the burden of showing that the deceased came to his death by accident arising out of and in the course of his employment; that the referee and commission were biased and prejudiced; "that its findings and award are frivolous, capricious, arbitrary and not a proper judicial determination of the facts and of the evidence."

The so-called finding is perhaps more in the nature of a legal conclusion than a finding of fact, and will necessitate an examination of the evidence to see if it supports such legal conclusion; the presumption being that it does. Because the case presents some rather unusual features, and because of the condition of the findings, we have concluded that we will review the evidence. We do this under that provision of the statute (section 1452, Rev. Code 1928), which says: "If necessary the court may review the evidence." We examine it, not as the trier of the facts, but for the purpose of determining whether there was

before the triers substantial evidence supporting their conclusion or finding. Where the evidence does not support the Industrial Commission's findings, they will not be permitted to stand, nor will conclusions based thereon. *Blankenship* v. *Industrial Commission*, 34 Ariz. 2, 267 Pac. 203. However, through a long and unbroken line of decisions, we have held that the same rule should be applied to the findings of the commission, actual and presumptive, that is applied to the verdict of a jury or the findings of a trial court, and that we will not disturb or set aside the commission's findings if supported by substantial evidence, or if the state of the evidence is such that reasonable men might differ as to its probative force. *Maryland Casualty Co.* v. *Industrial Commission*, 33 Ariz. 490, 266 Pac. 11; *Blankenship* v. *Industrial Commission, supra; Di Paolo* v. *Calumet & Ariz. Min. Co.*, 36 Ariz. 347, 285 Pac. 680; *Johnson* v. *T. B. Stewart Const. Co. et al.*, 37 Ariz. 250, 293 Pac. 20; *Doby* v. *Miami Trust Co. et al.*, 39 Ariz. 228, 5 Pac. (2d) 187; *Savich* v. *Industrial Commission*, 39 Ariz. 266, 5 Pac. (2d) 779; *King* v. *Alabam's Freight Co.*, 40 Ariz. 363, 12 Pac. (2d) 294.

The time, place and circumstances under which Dan Young's skull was fractured is the question. He left his home at Safford about July 10, 1931, for road camp in Navajo county, in good health, so far as the record shows, except he was, and had been for some time, suffering with sinus trouble and bad teeth. All contention that he was hurt in his head at the time his ankle was injured seems to have been abandoned on the trial and this proceeding, although this was the time fixed in Sadie Young's letter to the commission for such injury immediately after Young's death.

The evidence that his skull fracture was probably the result of a limb falling on his head from a burning tree consists of the testimony of one J. Butler,

who was working with Dan Young. This witness testified that he, Dan, and several others were clearing the right of way for road; that a big dead pine tree, fifty feet high and some forty or sixty feet from the right of way, caught fire; that he, Dan and Bill Merrill remained on the job while the rest of the crew went to dinner; that Merrill went for a saw with which to saw the tree down and that while he and Dan were there alone a burning limb, about four feet long, fell from the top of the tree and Dan said, "That damn limb pretty near knocked me down." This witness was then questioned and answered as follows:

"Q. Where did it hit him? A. Well, he said it hit him right across the head. I was so busy, like lots of other fellows would be around there, and the damn limb come down and hit him and I heard Dan grunt and I looked around and he said: 'That damn limb about got my goat.'

"Q. Did it raise a welt on his head, that you know of? A. No, it didn't seem to at that time. He didn't—

"Q. Didn't complain of it? A. The damn limb must have struck him just about half way—the broken part fell down.

"Q. It was an old, dead tree? A. Yes, and rotten, I suppose.

"Q. But he never complained about a welt on his head? A. No, he didn't.

"Q. And he never did say anything more about it? A. No.

"Q. Knocked his hat off, did it? A. Yes, it knocked his hat off."

This story of the burning limb falling on Dan's head was never told by Dan in his lifetime, and, if there was any sign of a trauma on his head at any time while he was working for Hodgman & Mac Vicar, no one ever knew of it or saw it. He made no complaint to his associates of being struck on his head by a falling limb, nor to anyone else, not even the

members of his family. In detailing a history of his illness to his physician after arriving home, he did not mention it. While he was in hospital at Safford and suffering severe pain, he said to A. J. Kennedy, a former employer and friend: "I know what the pain is in my head. It is caused from a blow that I received while working in that north country," where, as Kennedy says, he had been employed. Even though this statement is hearsay evidence, the commission had a right to accept it under the statute (Rev. Code 1928, § 1453) and the decisions of this court. *Ocean Accident & Guarantee Corp.* v. *Industrial Commission,* 34 Ariz. 175, 269 Pac. 77. But, if it be accepted, the commission might have reasoned that it did not identify the "blow I received" as coming from a falling limb of a tree, but rather that he might have received it in a variety of ways.

Butler told no one of it until some time after Dan's death, although he knew of investigators from the Industrial Commission being in the construction camp questioning Dan's fellow workers for the purpose of finding out, if possible, how and when Dan was hurt, his son being one of those quizzed.

The evidence shows that Dan, for some time before he died, had suffered with intense headaches, that stooping caused dizziness, nausea and blindness, and that he finally quit work on that account. The effort of the claimants was to synchronize the beginning of these headaches with the burning limb theory. Butler was on the job before Dan, and he testified Dan was not feeling well when he came on the job; that he didn't say what hurt him, but he imagined it was his teeth; that he went to Winslow and had two of them taken out; that he didn't look well when he came to the camp. John Adams, who was a fellow employee of Dan's, said that after he came on the job, but before his ankle was hurt, Dan told him he had had headaches for two months; that the doctor

said it was due to his teeth. Leslie G. Cowell, also a fellow employee, said Dan complained of having headaches ever since he first knew him—when he first came to the camp; that he was taking aspirin and calomel right along.

If the commission had found from the evidence that Dan Young died from an injury received in an accident while engaged in his employment by Hodgman & Mac Vicar, it being the commission's duty to pass upon the weight and credibility of evidence, we would not feel like reversing the commission. An examination of Butler's testimony discloses that he did not see the limb fall; did not see it strike Dan. He only had Dan's word for it, competent no doubt as part of the *res gestae,* but concerning a matter so inconsequential as not to be repeated or remembered. Merrill, who had momentarily disappeared to get the saw, was not told of the occurrence on his return. There were no exterior signs then or later of a traumatic injury on his head. The Industrial Commission, weighing these circumstances, concluded that the burden of showing the injury occurred while Dan Young was working for Hodgman & Mac Vicar was not sustained, which matter was peculiarly within its province, and we feel that under the uniform rules of this court we should not disturb its conclusion or finding.

Just how or when Dan Young's skull was broken will perhaps remain a mystery. There was considerable testimony introduced, entirely hearsay, to the effect that on or about July 10th, at a mutton roast at Stockton Pass not far from Safford, Dan Young was engaged in "horseplay" with one Dave Lee, and that Lee kicked him in the head. Whether there is any truth in this current report or not, it was unnecessary for the commission to determine. Eliminating it all from the record, still the finding by the

commission cannot be said to be without substantial support in the evidence.

The petitioners' accusation of bias and prejudice on the part of the commission is not sustained by the record. The criticisms directed at the referee, however, we feel are justified. This officer, as his name implies, is supposed to be neutral as between the parties and to impartially take and report the evidence to the commission for its consideration. The record shows the referee, instead of permitting the attorneys for claimants to examine witnesses offered by them to sustain their claim, would first examine such witnesses. Of course, this was an assumption of an unauthorized and unjustified power. Parties to litigation have a right to an orderly trial in which each side may introduce his own evidence without control or direction from the other, and the right to question one's own witnesses ought not to be arbitrarily taken from him by a court, much less a referee. The opposing side has the right of cross-examination. This is the orderly and regular way to test the honesty or truthfulness of a witness. This conduct of the referee, however unfair and reprehensible, does not appear to have prevented the claimants from fully developing their case. That being so, it is not apparent that claimants' cause was prejudiced by the irregular action of the referee.

The other criticisms of the findings and award have been disposed of by what we have heretofore said, and need no further consideration.

The award is affirmed.