[Civil No. 4677. Filed July 7, 1944.]

[150 Pac. (2d) 355.]

IN THE MATTER OF EDNA S. MITCHELL, et al., Applicants; THE MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Corporation, Petitioner, v. THE INDUSTRIAL COMMISSION OF ARIZONA, and RAY GILBERT, FRED E. EDWARDS and EARL G. ROOKS, as Members of The Industrial Commission of Arizona, Respondents.

Messrs. Fennemore, Craig, Allen & Bledsoe, for Petitioner.

Mr. H. S. McCluskey and Mr. Fred O. Wilson, for Respondent Commission.

Mr. Louis B. Whitney, for Applicants.

·UDALL, Superior Judge.—This is a *certiorari* proceeding under the Workmen's Compensation Law, Article 9, of Chapter 56, Arizona Code Annotated 1939, brought to this court by the Mountain States Telephone and Telegraph Company, a corporation, hereinafter termed the petitioner. It seeks a reversal of an award made August 12, 1943, to Edna S. Mitchell, applicant, for death benefits payable to her for the support of herself and their four minor children then aged 12, 10, 6 and 4 years, respectively. No question is raised as to the amount of the award.

· The petitioner-employer was insured with the Industrial Commission of Arizona, as the insurance carrier. Admittedly at the time of the injury both the employee, Mitchell, now deceased, and the employer were subject to the Arizona Workmen's Compensation Law and to the jurisdiction of the commission. Application for rehearing was denied on September 3, 1943, and within the time allowed by law this proceeding for review was initiated.

There are but two questions raised: (a) Does the evidence in the case support the finding of the Industrial Commission of Arizona that the deceased employee died as a result of carbon tetrachloride poisoning; (b) Did the deceased die *as a result of an accident* arising out of and in the course of his employment within the true meaning of the Workmen's Compensation Law of Arizona?

If this court finds the answer to either or both of these questions is in the negative then the award should be set aside, on the other hand if the answer to both questions is in the affirmative the award should be sustained.

A proper determination of these questions requires a close review and analysis of the evidence as well as the application of the statutory law to the peculiar facts of this case.

■ ■ While there is some conflict in the medical testimony, we state the evidence in its strongest light in favor of the claim of the applicant. The Commission having made an award to her she is entitled to have the evidence thus considered by us.

Clarence Mitchell, for whose death benefits were awarded by the Commission, was a white American, aged 38 years. He had been in the employ of the petitioner for several years maintaining telephones.

Prior to his last illness, which occurred late in the month of December, 1942, the general health of the deceased was good.

His employment record during the year 1942, based upon a 40-hour week, was nearly perfect. He was absent from work on account of illness only two days during the year.

On or about October 1, 1942, the deceased was assigned to the work of overhauling and repairing telephone switchboards maintained by the petitioner. As a recondition repair man he had worked at various locations prior to December 24, 1942, when he was assigned by the petitioner to service the switchboard at the plant of the Goodyear Aircraft Corporation, at Litchfield Park, Arizona.

In the work that he was doing subsequent to October 1, 1942, the deceased was required to and did use small quantities of carbon tetrachloride at different times and under varying conditions, without any apparent ill effects until he went to work on the switchboard at the Goodyear plant.

Specifically his work involved cleaning the contacts or terminals in the switchboard relays. The space between the contacts in the relays being only 30/1000 of an inch, the usual method of cleaning same was to dip a wooden toothpick in a small bottle of the carbon tetrachloride and apply the chemical to the points. Ordinarily the actual use of the fluid was not

more than five or ten minutes at any one time and it would be so used at intervals of six or seven times a day. The record does not disclose as to what amount or how frequently the deceased used this fluid on the Goodyear job. This work required close application and scrutiny.

The switchboard upon which the deceased was working at Goodyear was then located in a room 12½ x 11½ x 9½ feet, which was walled off from the officers' conference room by plywood. The ventilating system was so installed that it was not possible to ventilate the telephone switchboard room without ventilating the officers' conference room. There were employed in the telephone switchboard room, two telephone operators, a relief operator, and two girls operating the teletype machines, and there frequently were as many as ten people in the room.

The telephone switchboard room was a dark room with no windows. It had two small lattice vents near the floor; there was a trap in one corner which could be opened for an escape in an emergency. There was one door which opened near the machine shop but by reason of the noise from the machine shop it was necessary to keep the door closed, in order for the switchboard operators to perform their work. The only ventilation in the room came from a ventilator in the ceiling through which heat from the gas furnaces, or cold air could be brought in the room. This was controlled by a switch. When the cold air was turned on, the officers in the conference room, which was amply ventilated, directed that the switch be thrown and the cold air turned off. The telephone switchboard room was always stuffy and as testified to by some of the women operators "it was almost impossible to sit in there, it was choking and suffocating and practically all of the employees were ill, suffering from colds all winter." In passing it might be

noted that the quarters then in use were temporary. Later the exchange was moved to more commodious and better ventilated quarters.

While performing his work at the Goodyear plant, the deceased worked in small, confined quarters, about 2½ feet wide, between the switchboard and the cable terminal box. This space was further confined by the wall at one end and the teletype apparatus located within a few feet of where the deceased was working at the other end. The space where he was working was just barely large enough to admit his body and tool box and to permit him to squat down and sit on a box and do his work.

The telephone switchboard room was illuminated by fluorescent lighting but the deceased required an electric light back of the switchboard to see what he was doing. The light, of course, was productive of heat, as were the generator, batteries and motors located in the cable terminal box.

Carbon tetrachloride is highly volatile and heavier than air. Its tendency is to seek the lower levels of the room. Chemically it very closely resembles chloroform.

When the deceased was working with carbon tetrachloride the odor was prevalent throughout the room, to the extent that the switchboard operators complained of feeling nauseated and ill as a result thereof, and called upon him to stop using it. One of them testified "they hated to see him come to work because we knew we were going to get that odor again." When the operators complained of not feeling well, deceased held the bottle across the switchboard and let them smell the contents and told them that this stuff he was using was what was making them and him ill.

On December 24, after working with carbon tetrachloride under said conditions, deceased went to

Dr. Enfield, the plant doctor, complaining of gastro intestinal discomfort and gaseous indigestion. He was given a prescription for indigestion and when he did not improve he telephoned Dr. Armbruster, the family physician, and requested him to remain after office hours.

The deceased called on Dr. Armbruster after 5 p. m. December 24th and advised the doctor that he had been working with carbon tetrachloride. He complained of the same symptoms mentioned to the plant physician, plus a tight feeling in his chest, some cough, pain in his back and abdomen, and chilliness. He also told him that he had become acutely sick on the job. The doctor made no investigation or examination, accepting the symptoms the patient gave, he gave him a prescription and sent him home.

The deceased was sick all day Christmas. It had been his ambition for years to get the particular kind of job he was doing, and he returned to work at the Goodyear plant on December 28, 29, and 30, on which latter dates he frequently came from behind the switchboard holding his sides and complaining of his chest; and, would sit down holding his side and complaining, "I hurt so bad all over my chest—that stuff in the bottle kind of gets me."

On December 31st, on his way to Dr. Armbruster's office, the deceased collapsed and fell several times. He saw the doctor, complained of the same symptoms he had on December 24th, and some additional ones. He was not hospitalized, due to overcrowded hospital conditions. On his way home the deceased again collapsed and had to be assisted. About 9 p. m. January 1, 1943, he was admitted to the Good Samaritan Hospital, with further additional symptoms and died at 6 a. m., January 2, 1943.

In the death certificate, Dr. Armbruster, based upon an incomplete autopsy report, diagnosed the cause of

death as "amyloid leukemia"; and subsequently, after the full report was made, the diagnosis was changed to "poisoning and death caused by carbon tetrachloride."

Dr. Maurice Rosenthal, a graduate of a medical college of Virginia in 1926, with subsequent special studies, training, and experience in pathology, and the resident pathologist at the Good Samaritan Hospital, Phoenix, Arizona, examined and performed an autopsy on the body of decedent on January 2, 1943. He reported his findings and conclusions as: 1. Nephrosis, toxic acute (a swelling of the kidney); 2. Necrosis of liver, central (a general deterioration); 3. Subepicardial hemorrhage (hemorrhage under the pericardium); 4. Edema of brain and brain stem (a swelling, an increased fluid condition.) (Note: The meaning in plain English of the medical terms used by the doctor appear in parenthesis, *supra*.) The doctor confirmed his conclusions on cross-examination under oath as follows:

"I said that, . . . the findings of an acute nephrosis, associated with central necrosis of the liver in an individual who gives a history of having worked with carbon tetrachloride strongly suggests that we are dealing with a case of acute nephrosis and its complications, due to carbon tetrachloride poisoning."

Dr. Rosenthal further testified:

"The reason of my opinion was that after performing the autopsy and finding the changes of nephrosis and necrosis of the liver which I have always associated with some acute and rather violent poisoning; that when I was given the additional history of the subject—having worked with this chemical (carbon tetrachloride), I deduced, as is customary in our work, that the subject was most likely, that these changes were most likely the result of the poison he had been working with."

Concerning the time element the doctor testified:

"Q. And it is your firm opinion that the changes you found in the autopsy and the anatomical condition were produced by this carbon tetrachloride? A. It is my firm opinion the changes found could have been produced by carbon tetrachloride.

"Q. And reasonably were? A. I think probably they were."

The petitioners seek to have us overthrow the findings of the Commission on some six principal grounds:

(a) That the pathologist did not actually find carbon tetrachloride poison in the body of the deceased when performing the autopsy.

(b) That the testimony of Drs. Armbruster and Rosenthal was conjectural, and that each relied upon the testimony of the other as a basis for his conclusion as to the cause of death.

(c) That other poisons could have caused the same condition found in the body of the deceased by the pathologist.

(d) That certain symptoms of carbon tetrachloride poisoning, such as jaundice and irritation of the eyes, nose, throat and lungs, were not present in this case.

(e) That according to the authorities there was insufficient carbon tetrachloride in the deceased's possession (some four or five ounces in all) to have diffused the liters of space in the known cubical content of this room to such an extent, even if it had all been spilled at once, to have made the air in the room even highly dangerous, let alone furnish a lethal dose.

(f) That their medical witnesses, Drs. A. M. Tuthill and Norman S. Ross, both of whom are eminent in their profession, disagreed with the diagnosis as to cause of the deceased's death, of the other doctors called by the applicant. The two doctors named above readily admitted that neither of them were trained

pathologists. Their testimony was largely confined to opinion evidence.

We have carefully considered each of these objections and do not consider that any or all of them are fatal to the findings and conclusion of the Commission. In general they merely raise a conflict in the evidence.

We have repeatedly held that if there is any conflict of medical or other testimony, such conflict will be resolved in favor of the findings of the Industrial Commission. *Stephens* v. *Miami Copper Co. et al.,* 59 Ariz. 528, 130 Pac. (2d) 507; *Caekos* v. *Stanley Fruit Co.,* 55 Ariz. 72, 98 Pac. (2d) 471.

Every presumption is in favor of the award of the Commission and it is only in cases where there is no reasonable evidence to support its findings that the award will be set aside. We examine this evidence, not as triers of facts, but for the purpose of determining whether the record contains substantial evidence supporting their findings or conclusions.

Another well-settled rule in this jurisdiction is that in compensation proceedings, if evidence is such that reasonable inference may be drawn therefrom either way, the Supreme Court must sustain award of the Commission. We cite but two of our many cases so holding. *Vest* v. *Phoenix Motor Co. et al.,* 50 Ariz. 137, 69 Pac. (2d) 795; *Young et al.* v. *Hodgman & Mac Vicar et al.,* 42 Ariz. 370, 26 Pac. (2d) 355.

It is, of course, the law that when an application for death benefits is made it is incumbent upon the claimant to show affirmatively, to the satisfaction of the Commission, sitting as triers of the fact, (a) that there was an accident arising out of and in the course of employment; and (b) that the deceased was injured thereby, and (c) that the injury was the

cause of death. *Davis* v. *Industrial Commission,* 46 Ariz. 169, 49 Pac. (2d) 394.

It would seem to be conclusively established by all of the medical testimony in the case that the deceased came to his death as a result of some toxic substance getting into his system. Furthermore it was a case of acute and not chronic poisoning. It appears that while findings Nos. 3 and 4, as shown by the pathologist's report, *supra,* might occur under many circumstances and from various causes, yet findings Nos. 1 and 2 only appear as a result of an acute toxic condition. While the doctors might conjecture as to what particular poisonous substance caused death, the Commission evidently agreed with Dr. Armbruster, the family physician who said "there was no sense in going into something foreign because Mitchell wasn't using anything but carbon tetrachloride." It also appears from the record that the deceased was probably more susceptible to the effects of carbon tetrachloride than others. Dr. Rosenthal termed this an "idiosyncracies to different drugs." According to the doctors, had the deceased been highly allergic, or had an individual toxicity, to this drug, its first use would have produced prompt fatal results. There is nothing to show that the deceased was aware of his sensitiveness to this substance which he was constantly using.

We hold that there was ample evidence before the Commission to warrant their implied findings that the deceased came to his death as a result of inhaling carbon tetrachloride fumes between the 24th to the 30th day of December, 1942, which occurred in the course of his employment by petitioner.

It is suggested in the briefs that the death of the deceased resulted from an occupational disease and hence was not compensable under our Workmen's Compensation Law. Such a contention is untenable

for the reason that, while it is true an occupational disease is not compensable under the Workmen's Compensation Law, such a disease, *generally speaking* is one which is due wholly to causes and conditions which are normal and constantly present and characteristic of the particular occupation; that is those things which science and industry have not yet learned how to eliminate, such as silicosis or chronic lead poisoning and similar diseases. It is a disease *ordinarily* acquired by a slow, gradual process in the ordinary course of employment and as an incident thereto. *Industrial Commission* v. *Roth*, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463; *Ramsay* v. *Sullivan Mining Co.*, 51 Idaho 366, 6 Pac. (2d) 856; *Ross* v. *Ross*, 184 Okl. 626, 89 Pac. (2d) 338.

*The injury under consideration in this case occurred prior to the passage of the recently enacted Arizona Occupational Disease Disability Law, Chap. 26, Laws 1943. Hence we have no occasion in this proceeding to determine whether such an injury would be covered thereunder, nor need we now determine whether there is any overlapping of the two Acts.*

It appears that petitioner, and other companies similarly engaged, issue to their recondition repair men carbon tetrachloride in small quantities for use in their work. Other than deceased's fatal experiences, injury arising therefrom has been negligible, in fact no previous instance of injury to those thus engaged in this industry was cited by either party. The record in this case shows that the ordinary use of carbon tetrachloride in this business is not only not fatal but is harmless when properly used. The fatality here involved was undoubtedly caused by the inability of the deceased on the Goodyear job, for the reasons heretofore stated, to comply with the petitioner's instructions given to its employees as to the use of carbon tetrachloride, "to use only in well

ventilated places, and to avoid inhaling fumes." Evidently too much is not known about this rare type of poisoning, but it is recognized that the use of carbon tetrachloride is an industrial hazard. Major General H. L. Gilchrist, Chief of the U. S. Chemical Warfare Service states: "We are not yet ready, definitely, to announce the lethal concentration for single exposures." Bulletin 564, U. S. Bureau of Labor Statistics, pages 176, 177.

Having concluded that the first question stated at the beginning of this opinion must be answered in the affirmative, we turn now to the mere vexatious and perplexing question as to whether the deceased's death was the result of an injury by accident arising out of and in the course of his employment.

Such variable definitions have been given by the appellate courts of the United States to the words "injury by accident," "accidental injury," etc., and the application of such definitions to given cases or states of fact have resulted in such a divergence of concept and interpretation that the decisions cannot be harmonized or brought into unison. This is partly due to a difference in the statutes involved and partly because of a conflict of judicial thought and reasoning. Certainly the writer of this opinion has no intention of undertaking the herculean and impossible task of attempting to reconcile the various decisions.

Most of the states having comparable Workmen's Compensation statutes to Arizona, patterned their law after the Act passed by the British Parliament, and the appellate courts of the great majority of these states, including our neighboring states of New Mexico, Colorado, Utah and Idaho, have adopted and followed the liberal English rule announced by the House of Lords in the leading case of Fenton v. Thorley (1903) Arizona Code 443. From the jurisdictions adopting this rule numerous cases might be cited that

would support the ruling of the Industrial Commission in the instant case. To show this trend we cite but a few typical cases, the facts therein may not be comparable, but the liberal interpretation is unmistakable. *McNeely* v. *Carolina Asbestos Co.*, 206 N. C. 568, 174 S. E. 509; *Webb* v. *New Mexico Pub. Co.*, 47 N. M. 279, 141 Pac. (2d) 333, 148 A. L. R. 1002; *Tintic Milling Co.* v. *Industrial Commission*, 60 Utah 14, 206 Pac. 278, 23 A. L. R. 325; *United States F. & G. Co.* v. *Industrial Commission*, 76 Colo. 241, 230 Pac. 624; *Industrial Commission* v. *Roth, supra; Sullivan Mining Co.* v. *Ashenbach*, 9 Cir., 33 Fed. (2d) 1; *Tri-State Contractors, Inc., et al.* v. *Althouse*, 166 Okl. 296, 27 Pac. (2d) 1041; *Dee Memorial Hospital Ass'n* v. *Industrial Commission*, 104 Utah 61, 138 Pac. (2d) 233.

We have pointed out many times that the Workmen's Compensation Law of Arizona is based in the main upon that of Utah and the Supreme Court of Utah has said that their law was patterned after the Ohio statute. *Industrial Commission* v. *Frohmiller, supra.* In our decision in the leading case of *Pierce* v. *Phelps Dodge Corporation*, 42 Ariz. 436, 26 Pac. (2d) 1017, 1019, we came to a parting of the ways with the Utah court and the other courts following the English rule, on the vital question of the meaning of "injured . . . by accident" and particularly of the word "accident." We there held in effect that there must be some *sudden or instantaneous event or occurrence* which taken by itself can be recognized as an accident, and then that the injury must be shown to have followed as a consequence from that specific event. Coupled with this was the implication that there must always be an *external act or* occurrence, usually one of *violence,* which caused the injury or death.

This somewhat restricted and rather narrow rule announced in the *Pierce* case has been praised and followed outside of Arizona in the following cases: *Booke* v. *Workmen's Compensation Bureau,* 70 N. D. 714, 297 N. W. 779; *Stanton* v. *Minneapolis R. Co.,* 195 Minn. 457, 263 N. W. 433; *Demagalski* v. *State Industrial Accident Comm.,* 151 Or. 251, 47 Pac. (2d). 947.

On the other hand it has been cited and criticized, but not followed, in the following cases: *Smith et al.* v. *McHan Hardware Co.,* 56 Idaho 43, 48 Pac. (2d) 1102; *McCormick Lumber Co. et al.* v. *Department of Labor and Industries et al.,* 7 Wash. (2d) 40, 108 Pac. (2d) 807; *Stevenson* v. *Lee Moor Contracting Co.,* 45 N. M. 354, 115 Pac. (2d) 342; *Webb* v. *New Mexico Publishing Co.,* 47 N. M. 279, 141 Pac. (2d) 333, 148 A. L. R. 1002; *Christensen* v. *Dysart et · al.,* 42 N. M. 107, 76 Pac. (2d) 1; *Meyer* v. *Roettele,* 64 S. D. 36, 264 N. W. 191; *Lumberman's Mut. Casualty Co.* v. *Griggs,* 190 Ga. 277, 9 S. E. (2d) 84.

Our holding in the *Pierce* case is, however, the law in Arizona, unless we see fit to overrule or modify the same. But it requires no citation of authority for the proposition that this court is not bound by its former decisions, unless the declarations of principles in such former adjudicated cases commend themselves by their essential soundness.

Petitioners urge that the award made in this case cannot stand if we strictly adhere to the accident rule laid down in the *Pierce* case. This is doubtless true. While we agree that a correct ultimate conclusion was reached in disposing of the *Pierce* case, under the facts there shown, yet we now feel that probably too little weight was given to the peculiar and appropriate meaning in the law (Sec. 1–103, sub. 1, Arizona Code Annotated 1939) of the phrases such as "injured . . . by accident" and "accident" appearing in

our compensation law, which phrases had a well-defined and well-understood meaning at the time of the enactment of our Workmen's Compensation Act.

Furthermore it appears that in the *Pierce* case we did not discuss or consider, probably because it was not called to our attention, the phrasing of the constitutional mandate to enact a workmen's compensation law. Certainly the legislative intent can best be gleaned by reference to Section 8, Article 18 of the Arizona Constitution, which provides that "compensation shall be . . . paid . . . if in the course of such employment personal injury to or death of any such workman from any accident arising out of, and in the course of, such employment, *is caused in whole, or in part, or is contributed to,* by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof . . . ."

It will be noted that the italicized part of the Constitution just quoted is broader and more comprehensive than the legislative enactment appearing under Section 56–936, Arizona Code Annotated 1939. A construction of the latter must be governed by the constitutional provision.

Applying these principles to the instant case it is readily apparent that the poisoning of the deceased, which caused his death, was "caused in whole, or in part, or was contributed to, by a necessary risk or danger of such employment."

■ While accidental injuries are usually sudden happenings and are caused by some violent or external means such as a traumatic injury, not all accidents fall into such a mold, or such a straight-jacketed pattern. There is nothing in our statutory law, Sec. 56–931 (formerly Sec. 1421, R. C. 1928), that says that an industrial accident must be an instanteous happening or that violence need be a part

thereof in order for a resulting injury to be compensable.

In the exceptional cases, such as the one now under review, the injury suffered was unquestionably accidental, though the precise time of the beginning may have been uncertain. An injury may be gradual and progressive and not immediately discoverable. Here the poisonous effect was undoubtedly cumulative over the short period of time that the deceased was working at the Goodyear plant. The conditions under which the deceased was working were unusual and abnormal for the class of work he was doing. He was in a confined space, in an inadequately ventilated room, with a highly volatile, poisonous chemical, which should only have been used in a well-ventilated room. He breathed the fumes and was poisoned.

We know that the employer did not wilfully maintain the conditions there found to exist, or intentionally cause the poisoning and death. The deceased, although he apparently recognized that the fumes were dangerous, and returned to work in disregard of the doctor's order, cannot be charged with deliberately committing suicide. No one expected, anticipated or looked for the poisoning and death to deceased. The result was undesigned and unexpected. It was therefore an event which took place without one's foresight or expectation and hence a fortuitous happening.

We hold therefore, anything we may have said in the Pierce case to the contrary notwithstanding, that there was an injury by accident in this case within the meaning of the Arizona Law, as now interpreted, in that the inhalation by the deceased of the fumes from the use of the poisonous carbon tetrachloride, under the circumstances heretofore stated, produced effects that were not intended, foreseen or

expected. This was an unlooked for mishap, an unexpected, unusual and extraordinary event not reasonably contemplated as a part of normal conditions of employment.

In making this ruling we disavow, in advance, any intention of letting down all the bars in these Industrial cases; we have here removed only those bars which prevented justice being done in this case under a common-sense interpretation of the Constitution and statutory law of this State. The provisions of the Workmen's Compensation Act are remedial in character and should be construed liberally in favor of the workmen. *Ocean Acc. & Guar. Corp.* v. *Industrial Commission,* 32 Ariz. 265, 257 Pac. 641; *Butler* v. *Industrial Commission,* 50 Ariz. 516, 73 Pac. (2d) 703. The fund is created to protect the workman; but it is limited to injuries by accident arising out of and in the course of the employment. It is not a health or accident insurance fund. The deceased was an industrial casualty and his dependents are entitled to death benefits. We confine ourselves to a determination of the law as applied to the facts shown in this case.

Award affirmed.

ROSS and STANFORD, JJ., concur.

NOTE: McALISTER, C. J., having disqualified, the Honorable LEVI S. UDALL, Judge of the Superior Court of Apache County, was called to sit in his stead.