[Civil No. 4741. Filed January 29, 1945.]

[155 Pac. (2d) 628.]

GEORGE SMITH, Petitioner, v. ALUMINUM COMPANY OF AMERICA, Acting for and on Behalf of DEFENSE PLANT CORPORATION, HEDRICK–BECK–BATE, CONTRACTORS, Defendant Employer, AETNA CASUALTY AND SURETY COMPANY, Defendant Insurance Carrier, THE INDUSTRIAL COMMISSION OF ARIZONA, RAY GILBERT, EARL G. ROOKS, AND FRED E. EDWARDS, Members and Commissioners of Industrial Commission of Arizona, Respondents.

Mr. Herman Lewkowitz, Mr. Raymond R. Wein, and Mr. Jacob Morgan, for Petitioner.

Mr. C. Leo Guynn, for Respondent Employer.

Mr. H. S. McCluskey and Mr. David P. Jones, for Respondent Industrial Commission.

LaPRADE, J.—On and previous to July 24, 1943, petitioner was employed by respondent employers as a structural iron worker in the construction of the aluminum plant west of the City of Phoenix, Arizona. On July 24th, petitioner was overcome with heat, later diagnosed by his attending physician as "heat stroke," and became temporarily unemployable. In due time, petitioner filed his claim, liability was admitted by the employer, and payments of compensation for temporary total disability were commenced, pursuant to the Commission's order dated September 3, 1943. The final report of I. L. Garrison, the doctor in attendance, gave October 1, 1943, as the date upon which petitioner was able to work.

Petitioner worked intermittently at his regular trade from August 9, 1943, until December 8, 1943, when he was referred to a board of medical consultants composed of Drs. I. L. Garrison, A. M. Tuthill, and H. J. McKeown. They recommended that certain laboratory work be done. Petitioner thereupon was admitted to the hospital, and this phase of the medical investigation was carried out by Dr. Maurice Rosenthal.

On March 14, 1944, the Commission rendered its findings and award for temporary total disability from

July 26, 1943, to and including October 3, 1943. Petitioner, being dissatisfied with the award, filed his petition and application for a rehearing. The basis of his complaint, as stated in his petition, was:

"That he still suffers from the injury received by him; that he is unable to carry on his employment of the type and nature held by him because of physical disability caused by accident, subject of this petition for rehearing; that medical examination at this time will show that he suffers from permanent injuries, and disabilities."

The petition for rehearing was granted and the hearings held on April 27, 1944, after which, on June 28, 1944, the Commission, in effect, affirmed its award of March 14, 1944. These findings and award on rehearing were concurred in by two commissioners only. The third commissioner refused to concur. One of its findings on the rehearing was:

"That the disability from which this applicant claims to have suffered or claims to be suffering, after October 3, 1943, is not proximately the result of any personal injury sustained by accident arising out of and in the course of his said employment by the above-named defendant employer."

Petitioner has brought this decision here for review.

Petitioner in his petition for writ of *certiorari*, among other things, alleges:

(1) That the said findings and award on rehearing are not supported by the evidence, and are contrary to the evidence.

(2) That the evidence shows that the petitioner is still suffering from the accident and injury sustained by him, and will continue to so suffer, and that such accident and injury may become fatal, and may and usually does result in death, epilepsy, or insanity.

(3) That said findings and award of the Commission are not supported by the evidence, and are arbitrary,

in excess, and beyond its power; that the said findings do not support such award.

The sole question presented for review is whether or not there is substantial and competent evidence supporting the findings and award of the Commission that the applicant suffered no permanent disability as a result of the accident of July 24, 1943.

█ This court in *Federal Mut. L. Ins. Co.* v. *Industrial Comm.*, 1926, 31 Ariz. 224, 252 Pac. 512, announced the rule, which it has uniformly followed, and from which it has never departed, that when the Industrial Commission acts within its jurisdiction, and acts judicially, and there is any reasonable evidence— whether in conflict or not—and where the evidence is such that reasonable men may differ as to its probative force, that the findings of the Commission are conclusive and binding on the Supreme Court. *Blankenship* v. *Industrial Comm.*, 1928, 34 Ariz. 2, 267 Pac. 203; *Johnson* v. *Industrial Comm.*, 1929, 35 Ariz. 19, 274 Pac. 161; *Moeur* v. *Farm Builders Corporation*, 1929, 35 Ariz. 130, 274 Pac. 1043; *Young* v. *Hodgman & MacVicar*, 1933, 42 Ariz. 370, 26 Pac. (2d) 355; *King* v. *Orr*, 1942, 59 Ariz. 234, 125 Pac. (2d) 699.

Admittedly, heat stroke or sun stroke is regarded by both the medical authorities and the courts as a serious and frequently disastrous condition, often resulting in death and disability, and when proven is held to be compensable. *L. W. Daily Const. Co.* v. *Carpenter*, 1944, 114 Ind. App. 522, 53 N. E. (2d) 190; *Fidelity & Casualty Co.* v. *Adams*, 1943, 70 Ga. App. 297, 28 S. E. (2d) 79; *Malone* v. *Industrial Comm.*, 1942, 140 Ohio St. 292, 43 N. E. (2d) 266; *Douglass* v. *Riggs Disler Co.*, 1939, 122 N. J. L. 379, 5 Atl. (2d) 873; *Oklahoma Gas & Electric Co.* v. *Maloney*, 1939, 184 Okl. 465, 88 Pac. (2d) 363.

█ In view of the allegations of the petition for the writ challenging the sufficiency of the evidence to

substantiate the conclusion of the Commission, we are compelled to examine all the evidence, not as triers of the facts, but for the purpose of determining whether there was before the triers substantial evidence supporting its findings and conclusion. Cases, *supra.*

The following is a rather comprehensive digest of the evidence presented to the Commission and the consultant board of doctors:

On the day of the accident, at about the hour of 11 a. m. (M. W. T.), petitioner was employed as an iron worker, working up against a wall where there was no shade, engaged in burning steel with a torch. The official temperature for that date was 112° F. The petitioner felt dizzy and suffered from a headache. He associated his condition with his work. He stated that he did not know what was the matter with him; that he wanted to get home; and that he was sick. He asked to be dismissed from his work, but upon the request of his foreman remained until 3 p. m. At the end of the shift he claims that he staggered from his place of work to the gate where he was met by his wife who took him to his home where he had to be assisted into the house. After he arrived home, he took some home remedies and bathed himself with cold water for the two following days.

On July 26th, petitioner visited the office of Dr. Garrison who testified that when petitioner arrived at his office he had a blood pressure of 115/90, with pulse pressure of 25, which he deemed to be abnormal; that his face was blood-red, and that he was practically in collapse, and complained of a pain in the back of his head and sickness of the stomach. Dr. Garrison made a diagnosis of heat stroke. He testified that the effects may or may not affect the central nervous system, and, if so, it might take years to determine such fact. It further appears that petitioner worked at his usual trade and drew wages at the union scale for 19½ days

between October 4, 1943 and January 24, 1944. Petitioner was employed at his trade at the time of the rehearing. Petitioner testified, among other things, that he had repeatedly suffered spells of dizziness since the accident; that on one of the jobs upon which he had been employed since the accident, which required his working above the ground, he had suffered from the "shakes," became dizzy and sick, and was afraid that he would fall; that he thereafter got a job upon the ground; that he became so nervous that he could not hold the arc in the process of welding; that he later secured a job as a "lay-out" foreman; and that he was not able to perform satisfactorily the duties required due to nervousness and an inability to coordinate his movements with his thoughts. Petitioner testified that he was quite concerned over his mental condition; that he became faint at times, had to stop and steady himself; that he could not again hold a job as an iron worker in competition with fellow workers; and that he wanted medical relief so that he might confidently expect to produce the results that were expected of him as an iron worker.

Petitioner's wife substantiated his claims as to his outward physical condition on the day of the accident and several days thereafter, and his apparent spells of dizziness and instability of his legs. Ralph C. Shobe, business agent of the Iron Workers Union, testified that he was personally acquainted with the petitioner and had worked with him as an iron worker prior to the accident in question; that petitioner was a skilled craftsman; that it had been reported to him subsequent to the accident, that the petitioner got the "shakes" on the job; and that from these reports he had determined that it was unsafe to send the petitioner out on jobs which would call for work at elevations above the ground.

The report of the board of consultants filed January 14, 1944, reads as follows:

"We find at this time there is no evidence, objective or subjective, of any industrial pathology that is compensable."

During the progress of the rehearing, the portion of this finding to the effect that there were no subjective complaints was called to the attention of the doctors. They at that time admitted that in taking the history of the case during their consultation they had considered the subjective complaints of the petitioner and were aware of their claimed existence. They further admitted that the word "subjective" should not have been included in the finding. At the time of the rehearing April 27, 1944, Dr. Tuthill testified that it was his opinion that the petitioner did not suffer a heat stroke or heat exhaustion on July 24th; that if the petitioner did have a heat stroke, it was very likely he would have more trouble; that at the time of his examination of petitioner in December he could find nothing wrong with petitioner and knew of no reason why petitioner wasn't then able to return to work.

The testimony of Dr. H. J. McKeown corroborated the testimony of Dr. Tuthill. He attributed petitioner's complaints to a neurosis.

Dr. Rosenthal testified that he could find no "objective findings or abnormalities that he could connect with heat stroke or heat shock."

Dr. Louis J. Saxe, a practicing physician and surgeon specializing in the field of neurology and psychiatry, testified that as a result of his examination made on April 17, 1944, he could find no "objective condition" to account for the "subjective complaints"; that petitioner may have had a "mild heat exhaustion"; that the symptoms were not organic in nature and were purely mental. He stated that if the man had had a heat stroke it may cause mental deterioration,

but in his opinion he did not experience a "heat stroke."

Dr. Garrison, who was the petitioner's attending physician, diagnosed the petitioner's trouble as heat stroke and stated that in his opinion petitioner was disabled by reason thereof; that the full extent of disability might not be determined for several years; that when he saw the man July 26, 1943, he was in a state of collapse; that if petitioner again gets overheated, he may go into a collapse and die; and that in his opinion the man had permanent partial disability resulting from the accident. It is to be noted that Dr. Garrison at the time of the rehearing had changed his opinion with reference to the condition of petitioner from the opinion that he had entertained at the time in January when he signed the report as one of the three consultants to the effect that on January 14th he found no evidence of objective pathology attributable to the accident.

■■ The burden of proof was upon the petitioner to establish to the satisfaction of the triers of fact by a reasonable preponderance of the evidence that the so-called heat stroke left a residual permanent disability. *Johnson* v. *Industrial Comm.*, 1929, 35 Ariz. 19, 274 Pac. 161; *Davis* v. *Industrial Comm.*, 1935, 46 Ariz. 169, 49 Pac. (2d) 394. In determining whether this burden has been met, the Commission, as triers of fact, is subject to the same rules of law as to the credibility of witnesses and the weight to be given to their testimony as a court or jury in a civil action. Davis v. Industrial Comm., *supra*.

Three of the doctors testified positively that in their opinion the petitioner had not suffered a heat stroke on the day in question. Another doctor testified contra. Four of the doctors testified that in their opinion there was no residuary partial total disability. Two of them suggested that he was suffering a psychosis in the na-

ture of an anxiety neurosis induced by the accident alone and not by an injury. Another physician suggested that his apparent nervousness might be attributable to smoking three packages of cigarettes a day.

Counsel for petitioner earnestly insists that the conclusion of the Commission demonstrates that it gave no consideration to the "uncontradicted" testimony of the petitioner—his wife—and Mr. Shobe, all lay witnesses. The record conclusively shows that the doctors all considered petitioner's subjective complaints—they admitted that the petitioner, in their opinion, was honestly concerned over his condition and the sensations which he stated that he experienced. The doctors all were of the opinion that a heat stroke may cause mental deterioration, but at least four of them were of the positive opinion that petitioner had not sustained a heat stroke in the medical contemplation of the condition labelled "heat stroke," and concluded that petitioner would not suffer the dire and severe consequences that most generally follow heat stroke.

The triers of the facts may well have concluded that petitioner's concern and nervousness were neurotic and not traceable to any injury sustained by accident arising out of and in the course of the employment. The finding of the Commission was that the claimed disability was "not proximately the result of any personal injury sustained by accident . . . ."

█ We have heretofore recognized that psychosis is a compensable disease; but before psychosis as a disease can be determined to be compensable, it must have had its origin in injury. *American S. & R. Co. v. Industrial Comm.*, 1942, 59 Ariz. 87, 123 Pac. (2d) 163. The pattern cut in the case of *Phelps Dodge Corp. v. Industrial Comm. and Eads*, 1935, 46 Ariz. 162, 49 Pac. (2d) 391, 393, fits the factual situation in the instant case relative to petitioner's subjective complaints, and we quote approvingly therefrom:

"While the commission in its findings did not so state, the only conclusion to be drawn therefrom is that the commission believed respondent's neurosis was not induced by any personal injury he suffered but by a deep-set fear or apprehension of imaginary ailments that might follow as a result of his injury and the deplorable condition in which his family might be left. There was medical testimony to sustain such a conclusion. Whether this be a correct conclusion or not, it is not necessary to determine. There being no finding that the respondent's neurosis was the result of an injury, he must necessarily fail, as our statute makes that indispensably necessary to entitle him to compensation for disease."

 We conclude that there was substantial and competent evidence to sustain the finding of the Commission. We conclude further that petitioner did not carry the burden of reasonably establishing that the so-called heat stroke left any residual permanent disability.

The award is affirmed.

ROSS, C. J., concurs.

STANFORD, J. (Dissenting).—There is evidence given by physicians for the Industrial Commission that Smith cannot return to his work as a structural iron worker, which work he has been carrying on for eighteen years.

Dr. A. M. Tuthill said in his testimony that "I don't know what is the matter with him." And again he stated:

"The Referee: Under the facts in this case, would you recommend this man to go back to work and perform his duties as an iron worker in this climate? A. I would think not. If he has everything he has, he is a man to stay on the ground, and I have no doubt he has the nervous symptoms he complains of, because he seems perfectly honest about it."

Dr. H. J. McKeown, also called by the Industrial Commission, testified:

"Q. And do you have any explanation, can you offer any explanation as to the cause of the subjective symptoms he related to you if it wasn't heat stroke or heat exhaustion? A. I couldn't give you a cause for his present trouble at the present time, other than some neurosis.

"Q. What was that neurosis caused by, if you know? A. Well, he could have a fear of quitting his former occupation, just thinking about it.

"Q. Wouldn't that have a lasting effect, that fear? Wouldn't that have a lasting effect? A. It might for a few years, until he proved to himself that he was better than he thought he was.

"Q. It would have to be something he would have to overcome, if he could? A. Yes, this neurosis.

"Q. And would you say that would handicap him in any line of work he performed, or might subject him to a recurrence of what has been recited here? A. Well, it wouldn't be safe for him to be working high off the ground in structural steel work."

Under the power of the Industrial Commission they could let this man go with or without compensation and hold the matter under their control until they know definitely what he could do. If it is a fact that a man of his training, because of this work and the injury caused thereby, has to be reduced to a job on the ground that would pay him but a meager wage, then his case should be kept under the control of the Industrial Commission until such time as they could determine definitely what his rights should be.